STATE of South Dakota, Plaintiff and Appellee,

v.

David Lee LYKKEN, Defendant and Appellant.

No. 17478.

Supreme Court of South Dakota.

Argued Jan. 13, 1992.

Decided April 22, 1992.

Rehearing Denied May 28, 1992.

Mark Barnett, Atty. Gen., Wade A. Hubbard, Deputy Atty. Gen., Pierre, for plaintiff and appellee.

Lee M. McCahren, Vermillion, for defendant and appellant.

WUEST, Justice.

Appellant (Lykken) was charged by indictment with first-degree rape, kidnapping, first-degree burglary, and simple assault. Lykken was also charged with being an habitual offender. After a jury

trial, Lykken was found guilty on all counts charged in the indictment. He admitted to being an habitual offender. After a lengthy sentencing hearing, the trial court sentenced Lykken to a total of 225 years imprisonment. The court filed its judgment of conviction and sentence. Lykken filed a motion for a new trial which was denied. Lykken appeals raising the following issues:

I. Whether the trial court erred in refusing to admit into evidence explicit photographs and a tape recording of prior sexual conduct between Lykken and D.H.

II. Whether the trial court erred in denying Lykken's motion to dismiss (1) the kidnapping count because any movement or confinement during the rapes was merely incidental to the rapes and (2) the rape charge based upon a perceived lack of evidence to corroborate the victim's claims.

III. Whether the trial court erred in denying Lykken's motions for a mistrial based upon claimed misconduct by the State's Attorney.

IV. Whether Lykken's sentence violates the Eighth Amendment of the United States Constitution.

We affirm.

D.H., a sixteen-year resident of Vermillion, was a full-time student at the University of South Dakota and a part-time secretary for her church in early to mid–1990. She separated from her husband in May 1989 after a marriage of sixteen years. D.H. has two children. After the separation she was "lonely," "vulnerable" and "struggling." She met Lykken in a computer class in January 1990. At that time, D.H. was in counseling for her divorce. She found Lykken to be kind, comforting, and exceptionally attentive to her needs. Lykken and D.H. dated and enjoyed a close relationship for several months. This relationship included sexual intimacy.

D.H.'s primary concern became focused upon her divorce trial. Meanwhile, Lykken became very possessive and deeply involved in her divorce proceedings. D.H. found Lykken's interest quite "unusual."

In fact, when she received her divorce decree, in June 1990, Lykken appeared more upset than she was. Indeed, Lykken became so upset he would cry and threaten suicide. At this point, because D.H. was becoming more concerned about the divorce and custody of her children and because of Lykken's bizarre behavior, D.H. began trying to terminate her relationship with Lykken. During the week she received her divorce decree, D.H. told Lykken she wished only to be his friend and no longer wished to be romantically involved with him. Nonetheless, D.H. was unsuccessful in her attempt to sever her relationship with Lykken as he continued to phone her and to stop by her apartment without warning. She would explain the relationship was over, and Lykken would indicate he understood. Nonetheless, he continued to return.

On June 11, when D.H. received her divorce papers, Lykken called her threatening suicide because of the decree. D.H. was frightened for him and told him to see a counselor. At a later meeting between the two, Lykken instructed her how to distribute his property after he died.

On June 15, D.H. again attempted to conclude their relationship by writing Lykken a letter telling him she desired only to be friends. Lykken ignored the letter. When they met again later, Lykken wept.

D.H.'s attempts to end the affair became more abrupt as she met with continued failure. At one point, when Lykken appeared uninvited at her apartment, she drew an imaginary line at the door and told him he was not to cross it. She eventually became "unfriendly," behavior that was unusual for her. Nonetheless, Lykken continued to invite himself to her apartment early in the morning or late at night throughout June and early July.

On one occasion, while D.H. was at her home outside of Vermillion, Lykken appeared at the residence and offered to mow the lawn at the residence which was quite large. D.H. initially refused his offer, but relented. Late that same evening, Lykken searched D.H. out at the home of a friend, J.I., to inform D.H. he had completed the

mowing. D.H. was furious at Lykken's obsessive behavior.

On July 4, 1990, D.H. and J.I. visited the rural home so their children could enjoy fireworks. Again, Lykken appeared uninvited. D.H. permitted Lykken to remain, but the group departed early because of his presence.

D.H. received her divorce decree on July 9, 1990. That evening Lykken phoned D.H., and D.H. told him she did not feel up to dealing with him that evening. Lykken told her he was "really depressed" and needed someone to talk to desperately. Having observed this type of behavior in the past, D.H. chose not to respond to Lykken. Lykken shouted, "Well, excuse me!" and hung up. He phoned again at midnight, asking D.H. to pray with him. D.H. was tired and just listened to him. Lykken had a "message from God" for her. When the phone call terminated, D.H. went to sleep.

J.I. was present at the Fourth of July episode, and also remembered the mowing incident. She also recalled that Lykken kept attempting to get D.H.'s attention and would come to J.I.'s residence looking for D.H. After Lykken completed his call to D.H., he called J.I. Lykken was agitated about D.H.'s child custody order and began crying. J.I. was frightened during this call.

At approximately 1:15 A.M. on July 10, 1990, D.H. awoke to find someone sitting at the edge of her bed. Although it was quite dark in the bedroom, she recognized Lykken's voice as he said, "Dottie, why can't you love me?" D.H. told Lykken to leave, but he turned on the bedroom light and said he wanted to make love to her one more time before he died.

Lykken's advances became physical and D.H. pushed him away twice. Twice he slammed her hard onto the bed. Lykken had never treated D.H. that way before. As their struggles continued, Lykken tried to pull D.H.'s underwear off. She told him that he did not really want to do this, but he continued anyway. She put her legs together and crossed her ankles, but Lykken pinned her and was able to remove her panties.

D.H. noticed her bedroom door was closed and locked. Lykken told her to remove her nightshirt, but she refused. Lykken then growled, "Take it off!" At one point, as Lykken was attempting to remove D.H.'s shirt, he held her throat so that she could not breathe.

D.H.'s children were in the apartment when this occurred. She was concerned about her children hearing the struggle and being frightened. D.H. choked Lykken back until he released his grip on her throat. Lykken ordered, in a tone different than his normal voice, "Don't piss me off!" which frightened D.H. even more. Finally, she removed her nightshirt out of fear. At that point, Lykken climbed on top of D.H., pinning her legs. He then fondled her breasts and penetrated her vagina. While this was occurring, D.H. attempted to think about other things and tried to look away from Lykken. However, Lykken forced her to continue looking at him.

At one point, Lykken lost his erection and lamented to D.H. that he could not do anything right, not "even leave a sperm sample for the police." He forced her to hold his testicles while he masturbated until his erection returned.

At least four rapes took place, most episodes lasting fifteen to twenty-five minutes. Throughout the ordeal, Lykken would chat with D.H. when he was not raping her. He told D.H. that, before he killed himself, he should kill her ex-husband and then asked D.H. for a few minutes to escape so that he could kill himself before she called the police.

At about 4:15 A.M., the rapes terminated. Because he had ejaculated on her back, Lykken wiped D.H. off with tissues which he then threw in the trash. He then asked D.H. whether she wanted to call the police. D.H. lay quietly, in fear for her life, remembering that he had looked "like an animal." She begged Lykken to leave before her children awoke. Lykken left at approximately 4:45 A.M.

After D.H. heard Lykken leave, she threw her underwear away and inspected

her home. The front door was still locked, and the inside chain-lock was still attached. Earlier she had left the patio storm door open, but had locked the inside screen door. She re-locked that door and returned to bed. D.H. remained in bed until 9:00 A.M. refusing to answer the phone. She remained in the bedroom even after the children were awake, explaining that she was sick. At 9:00 A.M., D.H. informed J.I. of the incident. They determined D.H. should get her children to safety, talk to her minister, and then call the police.

As D.H. proceeded to depart from Vermillion to bring her children to her grandmother's residence, Lykken intercepted her and attempted to block her with his pickup as she drove down a Vermillion street. D.H. was able to swerve onto a lawn and outmaneuver Lykken. When she returned to Vermillion, D.H. went to the house of her minister. While she was at the minister's home, Lykken drove by.

At about noon, the minister, D.H., and others went to the police station in Vermillion where they met with Detective Ray Hoffman. At D.H.'s apartment, Hoffman secured the bed sheets, D.H.'s underwear and the discarded tissues. Lykken was subsequently arrested. Lykken claimed he and D.H. talked all night, and that he left in the morning. Detective Hoffman later obtained samples of D.H.'s blood and samples of Lykken's blood and hair. The evidence was sent to the Division of Criminal Investigation. The State Forensics Laboratory examined the underwear and the tissues for semen. In addition, D.N.A. testing was conducted. Detective Hoffman observed bruises on D.H.'s arm and a fingernail mark on her throat. He linked the "moon-shaped" gouge on D.H.'s neck to Lykken's having choked her. He linked the bruises on D.H.'s arm to his forced removal of her underwear.

At trial, the State's expert testified that only two percent of the male population would have a blood genetic picture of that identified in the semen evidence. Lykken was a genetic match. Similar testing was done to the sheet from D.H.'s bed. Only nine percent of the population could provide a match, which Lykken did.

Lykken defended the rape charge by claiming that D.H. consented.[1] D.H. maintained at trial that at no time did she consent to Lykken's acts. Further facts will be discussed in connection with each issue to which they are relevant.

## I. EVIDENCE OF VICTIM'S PRIOR SEXUAL CONDUCT.

Prior to trial, Lykken filed a motion to introduce evidence of prior sexual conduct between D.H. and himself. The State filed a motion in limine to limit evidence of prior sexual experiences between Lykken and D.H. The trial court allowed general testimony regarding prior sexual conduct between Lykken and D.H. The court concluded such evidence was relevant to the issue of consent. However, the trial court refused to admit explicit photographs of D.H. and Lykken, an explicit tape recording made by D.H. and explicit testimonial details of various sexual activities. The court reasoned the probative value of such evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and its capacity to mislead the jury, relying on SDCL 19-12-3 (1987).[2]

At trial, D.H. testified she and Lykken previously had an ongoing sexual relationship which she terminated prior to the rapes. Lykken's attorney cross-examined

1. SDCL 22-22-1 (1988) provides in pertinent part:
Rape is an act of sexual penetration accomplished with any person other than the actor's spouse under any one or more of the following circumstances:
(1) Through the use of force, coercion or threats of immediate and great bodily harm against the victim or other persons within the victim's presence, accompanied by apparent power of execution....

2. SDCL 19-12-3 (Rule 403) provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

D.H. extensively about specific instances, including times, places and some details. Nonetheless, Lykken argues the trial court erred in ruling inadmissible the explicit photographs, the tape recording and the details of the actual sexual activities. We disagree.

SDCL 23A–22–15 (1988) provides:

In prosecutions for rape, evidence of specific instances of a victim's prior sexual conduct shall not be admitted nor reference made thereto before the jury or jury panel, except as provided in this section. Whenever a party proposes to offer evidence concerning a victim's prior sexual conduct, the court shall first conduct a hearing in the absence of the jury and the public to consider and rule upon the relevancy and materiality of the evidence.

In *State v. Woodfork*, 454 N.W.2d 332 (S.D.1990)[3] we stated:

As a general rule, the admission of evidence concerning a rape victim's prior sexual conduct is precluded by SDCL 23A–22–15. This statute, like rape shield laws in other jurisdictions, represents a legislative determination that in most instances, such evidence is not relevant and highly prejudicial to the victim. Evidence of a rape victim's prior sexual encounters may be admitted if the trial court finds that it is relevant and material to a fact at issue in the case. This determination is entrusted to the sound discretion of the trial court. We will not interfere with the trial court's determination unless an abuse of discretion is clearly demonstrated.

*Id.* at 336–37 (citations omitted). *Accord State v. Blalack*, 434 N.W.2d 55, 57 (S.D. 1988). We also noted "[a]n abuse of discretion 'refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence.'" *Woodfork*, 454 N.W.2d at 335 (quoting *State v. Bartlett*, 411 N.W.2d 411, 414 (S.D.1987)).

A case which is directly on point, *People v. Zysk*, 149 Mich.App. 452, 386 N.W.2d 213, *appeal denied*, 389 N.W.2d 695 (1986), was cited by this court in *Blalack*, 434 N.W.2d at 57. In *Zysk*, the defendant admitted he had intercourse with the victim but claimed the victim consented. In support of his defense, Zysk sought to introduce evidence of his past sexual relationship with the victim, who had admitted in separate proceedings to previous "oral sex and bondage episodes." The trial court ruled Zysk could question the victim about previous oral and vaginal sex episodes but refused to admit evidence of the other sexual episodes on the grounds that it was not relevant. *Id.* 386 N.W.2d at 216.

The Michigan Court of Appeals affirmed. *Id.* 386 N.W.2d at 217. The *Zysk* court found the other acts were distinct and unrelated to the brutal acts involved in the charged offense.

The excluded evidence of unrelated sexual acts had no relevance to the issue of consent and was highly prejudicial. Moreover, the court admitted evidence of previous sexual conduct which involved the same acts as occurred during the rape. Since there was no other basis to justify the admission, we hold that the trial court did not abuse its discretion in limiting the evidence of prior sexual conduct between the parties.

*Id.* 386 N.W.2d at 217.

Like the trial court in *Zysk*, the trial court here did not prohibit Lykken from presenting evidence that D.H. had engaged in sexual intercourse with Lykken on previous occasions. Sexual episodes between the defendant and complainant will often be relevant to the issue of consent. Here, the complainant testified she and Lykken had a previous sexual relationship. Further, none of the photographs portrayed Lykken and D.H. in any activity similar to what occurred during the rapes. Thus, the probative value of the photographs, the recording and the "details" of the sexual encounters was minimal.

---

**3.** Contrary to Lykken's misquotation and misinterpretation of language in that opinion, we did *not* hold that evidence of prior acts of sexual intercourse between a complainant and defendant is *always* admissible. Woodfork did not have intercourse with the complainant before the rape.

The evidence did present substantial danger of unfair prejudice, confusion of issues or needless presentation of cumulative evidence. "Danger of unfair prejudice" means the evidence has the capacity to influence the jury to decide the case on improper grounds. *Amdahl v. Sarges,* 405 N.W.2d 638, 639 (S.D.1987). In other words, it has the capacity to persuade by illegitimate means. *State v. Lodermeier,* 481 N.W.2d 614, 626 (S.D.1992); *State v. Goodroad,* 442 N.W.2d 246, 250 (S.D.1989). Since D.H. admitted her sexual involvement with Lykken; the photographs, tape recording and details could only have served to inflame the jury so that, feeling no empathy for D.H., they may not have cared whether she was raped. We conclude the trial court did not abuse its discretion in excluding this evidence.

## II. MOTIONS TO DISMISS.

A motion to dismiss is brought pursuant to SDCL 23A–23–1 (1988). *State v. Bult,* 351 N.W.2d 731, 734 (S.D.1984).

> In reviewing a motion for judgment of acquittal, the trial court must view the evidence in a light most favorable to the nonmovant. *State v. Caylor,* 434 N.W.2d 582 (S.D.1989); *State v. Ashker,* 412 N.W.2d 97 (S.D.1987). A motion for judgment of acquittal is properly denied if the State has introduced evidence upon which, if believed by the jury, they may reasonably find the defendant guilty of the crime charged. *State v. Olson,* 408 N.W.2d 748 (S.D.1987).

*State v. Corder,* 460 N.W.2d 733, 738 (S.D. 1990). *Accord Bult,* 351 N.W.2d at 734.

### A. *Kidnapping Count.*

Lykken was charged with kidnapping because he seized or confined D.H. to facilitate the perpetration of a felony (rape) in violation of SDCL 22–19–1(2).[4] After the State presented its case-in-chief, Lykken moved to dismiss the kidnapping count claiming the only act of confinement was incidental to the crime of rape and that no asportation of the victim occurred at any time. The court denied the motion.

The case upon which Lykken primarily relies is *State v. Reiman,* 284 N.W.2d 860 (S.D.1979). In *Reiman,* four defendants were charged with rape and kidnapping. Two of the defendants abducted the victim from a bar and took her to a paint shop. Two of the defendants, Elliott and Onstott, participated in the rapes which occurred at the paint shop. However, their acts, which were alleged by the State to be kidnapping, consisted only of holding the victim down on a mattress to facilitate the act of rape and at one point helping another abductor as the victim fought. The facts are not well developed in the opinion as to what acts of confinement or movement Elliott or Onstott participated in. The *Reiman* court reversed Elliott's and Onstott's convictions for kidnapping reasoning any movement of the victim compelled by the two was merely incidental to the rape and did not substantially increase the risk of harm otherwise present. *Id.* at 873–74.[5]

Later, in *State v. Curtis,* 298 N.W.2d 807, 810 (S.D.1980), we held Curtis was guilty of kidnapping where he attempted to murder his victim during a forced automobile ride. The *Curtis* court concluded the kidnapping was not incidental to the crime of attempted murder. *Id.* at 810–11. The test set out by these two cases became known as the *Curtis/Reiman* test. The *Curtis* opinion did not discuss the increased risk prong of the *Reiman* test as it applied the test to the facts before it.

---

**4.** SDCL 22–19–1 (1988) provides in pertinent part:

> Any person who shall seize, confine, inveigle, decoy, abduct or carry away any person and hold or detain such person ... for any of the following reasons:
>
> .   .   .   .   .
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> .   .   .   .   .
>
> is guilty of kidnapping....

**5.** We point out that Lykken did not propose a jury instruction setting out the *Curtis/Reiman* test. His only argument is that the court should have dismissed the kidnapping count or, in other words, should have found as a matter of law that no kidnapping occurred.

■ We most recently discussed this issue in *State v. St. Cloud*, 465 N.W.2d 177 (S.D.1991). In *St. Cloud*, the defendant forced his alcohol counselor at knifepoint to drive him to a country home where he raped her. We noted that *Reiman*

> effectively "narrows the applicability of the South Dakota kidnapping statute to those cases in which 1) the kidnapping is not an essential element of some other clearly identified crime and 2) the victim is exposed to an increased risk of harm because of the kidnapping."

*St. Cloud*, 465 N.W.2d at 181 (quoting *Curtis*, 298 N.W.2d at 810). We then explained that *Curtis* itself narrowed the application of *Reiman*. *Id.* The *St. Cloud* court then concluded:

> ˙ *Neither movement nor prolonged confinement of the victim is an essential element of first-degree rape under SDCL 22-22-1(1).* Moreover, most movement of rape victims by their attackers is designed to seclude the victim from possible assistance and to prevent escape—which inevitably increases the risk of harm to the victim.
>
> We read *Reiman* and its progeny merely to say that a kidnapping may be incidental to another crime when the kidnapping consists either of confinement of minimal duration or of minimal movement within the same premises.... *Where, however, the kidnapping consists of prolonged confinement* or movement from one premises to another—

even if only from a parked car to an abandoned house—then one and probably both prongs of the *Reiman/Curtis* test cannot be met and *the kidnapping cannot be considered incidental to another crime.*

*St. Cloud*, 465 N.W.2d at 181 (emphasis added).[6] The *Curtis/Reiman* doctrine is not meant to allow a rapist a free kidnapping because he also commits a rape. It is meant to prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape. Such brief restraint does not normally increase the victim's risk of harm over and above that already inherent in the act of rape.

■ Looking at the evidence in a light most favorable to the State, as we must, we cannot hold as a matter of law that the confinement was merely incidental to the crime of rape. During trial, the following testimony was given by D.H. while she was examined by the State's Attorney:

A. About 1:15 that morning I was awakened by [Lykken] sitting on the edge of my bed.

Q. And how did he contact you?

A. He sat down and he said, "Dottie, why can't you love me?"

. . . .

And I said, "It's not making love if I don't want to do it and I don't want to

---

**6.** Even in California, the *Daniels* test (*People v. Daniels*, 71 Cal.2d 1119, 80 Cal.Rptr. 897, 459 P.2d 225, 238 (1969)) adopted by this court in the *Curtis/Reiman* decisions no longer remains in pure form. In *In re Earley*, 14 Cal.3d 122, 120 Cal.Rptr. 881, 534 P.2d 721 (1975), the California Supreme Court upheld a kidnapping conviction where the defendant forced the victim to ride 10–13 blocks in a vehicle and then robbed him. The court held the movement was substantial, not "merely incidental to the commission of robbery," even though it may have been solely to facilitate the commission of the robbery. *Id.*, 120 Cal.Rptr. at 886–87, 534 P.2d at 726–27. Thus, if movement is substantial, the first prong of the *Daniels* test is met. The *Earley* court also found the victim was exposed to an increased risk because the defendant was driving at night with sunglasses, holding a gun in one hand, and presumably dividing his attention between his driving and the victim. *Id.*,

120 Cal.Rptr. at 888–89, 534 P.2d at 728 (discussing *People v. Thornton*, 11 Cal.3d 738, 114 Cal. Rptr. 467, 523 P.2d 267 which stated any substantial asportation by force necessarily exposes the victim to greater risk). *Compare Id. with People v. Mutch*, 4 Cal.3d 389, 93 Cal.Rptr. 721, 726, 482 P.2d 633, 638–39 (victims struck with gun and moved about inside building during robbery—held: Pistol whipping is a risk inherent in crime of armed robbery). *See also, People v. Daniels*, 202 Cal.App.3d 671, 248 Cal.Rptr. 753 (Cal.App.1988) (discussing the current state of the *Daniels* test). It appears the *Daniels* test has evolved to roughly the same state as the *Curtis/Reiman* test as enunciated in *St. Cloud* quoted in the text. In fact, in *St. Cloud*, we noted that most movement of rape victims is designed to seclude the victim and prevent their escape inevitably increasing the risk of harm to the victim. *St. Cloud*, 465 N.W.2d at 181.

do this, get ... out of my house." And I pushed him again.

. . . .

A. And then he grabbed ahold of my upper arms and slammed me into the bed twice. And just—Like this (demonstrating), real hard into my bed.

. . . .

A. My bed is on the wall opposite my bedroom door, and the first thing I checked was to see if the door was open. And it was shut. And if it was locked, and it was.

. . . .

And he took his hand and choked me into the bed so I couldn't breathe. And at that point I had this flash image in my mind of my children awakening to a struggle, and coming to my bedroom door that was locked and being frightened.

Q. Could you have called the police?

A. No, I could not have.

. . . .

A. At one point he is laying beside me with his arms across my abdomen, and I start to get up to go to the bathroom and he won't let me. And I said, "David [Lykken], if I don't go to the bathroom I am going to wet the bed, what do you want me to do?" And, "Please let me go to the bathroom."

. . . .

Q. And he did let you go to the bathroom?

A. Yes, he did.

Q. Where is the bathroom in your house, or your apartment?

A. I have two bathrooms, a full bath off of the main hallway by the bedroom, and then I have a half bath off of my bedroom.

Q. And which bathroom did you go to?

A. I used the one in my bedroom.

Q. What happened after you went to the bathroom?

A. While I was sitting on the toilet I was trying to figure out how I could get out of here and get some help. And the window in my bathroom is little and I was naked and I knew there was no way I could get out that way. So I walked out of the bathroom and walked out into the hallway. I was going to try to get to the kitchen to the phone. And David jumped off of the bed and was right at my side and said "What are you doing?" And I said, "I'm checking on my children." And I checked on both kids and they were sound asleep. And he grabbed my arm and pulled me back into the bedroom, shut the door and locked it. And didn't throw me on the bed but put me back on the bed and continued. This was only about 3:00 in the morning, so the sex continued for another over [sic] an hour.

Q. How many times did he—How many separate times did he penetrate you?

A. I didn't keep close track, but at least four different episodes.

Q. And those episodes would generally last how long?

A. Fifteen, 20, 25 minutes.

Q. Okay. And did he talk about anything else as he would do these things to you?

A. He talked about things that we had done, he talked about other women that he had been with. At one point he was crying and saying "all of my relationships end up like this, I don't know what I do wrong. Why can't I be good enough." Talked about that he had called a past woman that he had had a relationship with, talked to her that night.

. . . .

Q. Did there ever come a time when the sexual penetration ended?

A. Yes.

Q. About what time would that have been?

A. About 4:15.

. . . .

I said, "I think you need to go, the kids will be waking up." It's about a quar-

ter to 5, he has been talking for about half an hour. And I said, "Please go, you need to get out of here, my kids are going to wake up, I don't want them to know you were here." And he got his clothes on and went.

We now must analyze these facts in light of the *St. Cloud* opinion. Lykken initially locked D.H. in her bedroom. He prevented D.H. from leaving to use the bathroom. Later, he acquiesced. When she attempted to reach her phone, he forced D.H. back into her bedroom and again locked the door, an act obviously meant to seclude D.H. to prevent the arrival of assistance and to prevent her escape. The jury could reasonably have found the confinement here was not of minimal duration, since it lasted from approximately 1:15 A.M. until approximately 4:45 A.M. The jury could have reasonably concluded this confinement increased the risk of harm to D.H., especially since she was repeatedly raped while so confined. The jury could also have found this extended confinement was not necessary to complete the individual acts of rape which lasted from fifteen to twenty-five minutes each. *See St. Cloud,* 465 N.W.2d at 181.[7] We conclude the trial court was correct in denying Lykken's motion to dismiss the kidnapping count.

B. *Motion to Dismiss Based Upon Lack of Corroboration.*

■ Lykken claims the rape charge should have been dismissed after the State's case-in-chief because D.H. admitted committing perjury during her previous divorce trial and there was no corroborating evidence of D.H.'s allegations. In his reply brief, Lykken cites *Blalack,* 434 N.W.2d at 59, wherein we stated:

> [A]s a general rule, it is not essential to a sexual offense conviction that the testimony of the victim be corroborated by other evidence.... This general rule, however, is not without an exception. A person may not be convicted of the crime of rape upon the uncorroborated testimony of the victim if it appears that such testimony is unreliable or improbable or that the witness has been fairly impeached.

(citing *State v. Grey Owl* (*Grey Owl II*), 316 N.W.2d 801, 804 (S.D.1982); *State v. Fulks,* 83 S.D. 433, 437, 160 N.W.2d 418, 420 (S.D.1968)). Arguably, D.H.'s testimony may have been unreliable, since she admitted lying under oath in her divorce trial. No evidence indicated she was being untruthful during the rape trial however. *Cf. Grey Owl II,* 316 N.W.2d at 802 (victim admitted making prior inconsistent statement denying the rape had occurred).

In any event, we feel D.H.'s testimony was sufficiently corroborated for the matter to go to the jury. D.H. reported the rape to police promptly. This is considered corroborative evidence. *Grey Owl II,* 316 N.W.2d at 805. D.H.'s underwear, the tis-

---

7. The following cases have found the confinement involved was not incidental to the rape or other crime charged in factual situations similar to the case before us: *State v. LaFrance,* 117 N.J. 583, 569 A.2d 1308, 1310–14 (1990) (victim of robbery bound in bedroom for at least 30 minutes to facilitate the robbery); *State v. Gordon,* 161 Ariz. 308, 778 P.2d 1204, 1211–12 (1989) (prior to rape, defendant "grabbed the victim, threw her to the floor and held her, thus committing the kidnapping, and then, while holding her, committed the sexual assault"); *Marsh v. State,* 546 So.2d 33 (Fla.Dist.Ct.App. 1989) (victim was bound, gagged, blindfolded and wrapped in blankets for up to one half hour while defendant ransacked the apartment); *State v. Williams,* 308 N.C. 339, 302 S.E.2d 441, 447 (1983) (evidence that defendant restrained victim in her own home for several hours, forced her to sit in living room, and accompany defendant to kitchen constituted evidence of restraint sufficient to support conviction for kidnapping separate and apart from restraint *inherent* in the crime of rape); *Burton v. State,* 426 A.2d 829, 832–35 (Del.Supr.Ct.1981) (defendant confined victim to abandoned building, moved her from room to room, grabbed and twisted victim's arm when she attempted to leave and choked her—restraint amounted to much more than that incidental to crime of rape); *State v. Lee,* 177 Conn. 335, 417 A.2d 354, 357–58 (1979) (detention not incidental to crime of robbery where defendant moved victim at knifepoint to his bedroom, detained him there for 15 minutes during course of robbery, and left him tied up for approximately 10 minutes). *See also* Annotation, *Seizure or Detention for Purpose of Committing Rape, Robbery, or Similar Offenses as Constituting Separate Crime of Kidnapping,* 43 A.L.R.3d 699 (1972).

sues and the bedsheets were removed by police and examined by forensics experts. They were found to contain semen almost certainly deposited by Lykken. Detective Hoffman testified he saw bruise marks on D.H.'s arm and a fingernail mark on her throat consistent with the struggle which D.H. claimed occurred between herself and Lykken. Physical evidence will corroborate a rape charge. *Reiman*, 284 N.W.2d at 873. D.H.'s friend, J.I., testified about Lykken's strange behavior and about D.H.'s emotional state when she told J.I. about the rape. The emotional state of the victim when she reports the incident is also corroborative of her testimony. *Grey Owl II*, 316 N.W.2d at 805. Shortly after D.H. told J.I. of the rape, Lykken called J.I. inquiring as to whether D.H. had notified police. Others, including J.I. and D.H.'s counselor, testified as to what D.H. told them regarding the rape incident. Her accounts to each were consistent. Lykken does not contend otherwise. We conclude, assuming D.H.'s testimony was impeached, that ample corroborating evidence was presented to submit the matter to the jury.

### III. MOTIONS FOR MISTRIAL AND FOR A NEW TRIAL.

Lykken claims various actions of the prosecutor were improper, and therefore, the court should have granted a mistrial. In his brief, Lykken cites no authority to support his argument. We have repeatedly held failure to cite authority supporting an argument violates SDCL 15–26A–60(6) (1984) and constitutes a waiver of that issue. *Ashker v. Solem*, 457 N.W.2d 473, 478 (S.D.1990); *State v. Dixon*, 419 N.W.2d 699 (S.D.1988).

In addition, in his statement of issues, Lykken claims the trial court erred in refusing to grant a new trial. No discussion of this issue is included in the brief. This issue is also deemed waived. *See* SDCL 15–26A–60(6); *Moosemeier v. Johnson*, 412 N.W.2d 887, 888 (S.D.1987); *Peterson v.*

*Safway Steel Scaffold Co.*, 400 N.W.2d 909, 911 (S.D.1987).

### IV. LENGTH OF SENTENCE.

In his final assignment of error, Lykken argues his sentence totalling 225 years violates the eighth amendment prohibition against cruel and unusual punishment. After Lykken was convicted, he admitted to being an habitual offender. The trial court sentenced Lykken to serve the following terms in the South Dakota State Penitentiary: 100 years for the rape count; 100 years for the kidnapping count, to be served consecutively with the rape sentence; 25 years for the burglary count, also to be served consecutively with the first two sentences; and 2 years for the simple assault count, to be served concurrently with the other sentences for a total sentence of 225 years. According to Lykken, his release date with credit for all accumulated good time possible is 2215. He would be seventy-nine years of age when first eligible for parole, in the year 2033.[8] The State does not dispute his calculation.

"On appeal, we first determine whether the sentence 'shocks the conscience' or is so disproportionate to the crime that it activates the Eighth Amendment 'within and without jurisdiction' proportionality tests...." *State v. Basker*, 468 N.W.2d 413, 418 (S.D.1991) (citing *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)). *Accord State v. Andrews*, 393 N.W.2d 76, 82 (S.D.1986); *Weiker II*, 366 N.W.2d at 827. "Absent a sentence which is so excessive in duration that it shocks the conscience of the court, it is well settled in South Dakota that a sentence within statutory limits is not reviewable on appeal." *State v. Janssen*, 371 N.W.2d 353, 356 (S.D.1985) (citing cases).

Obviously, Lykken received a very lengthy sentence. Nonetheless, the sentence was within the statutory limits. Lykken's crime was heinous. He admitted he had previously been charged with kid-

---

**8.** Lykken argues he has in fact received a sentence of life imprisonment. We have previously stated that for purposes of eighth amendment analysis, a sentence which does not allow release until after a defendant's life expectancy has passed is *not* the same as life imprisonment without parole. *State v. Weiker*, 366 N.W.2d 823, 825 (S.D.1985) (*Weiker II*).

napping, rape, aggravated assault, and tampering with a witness (B.O.) which charges were dropped in exchange for a guilty plea to burglary. Lykken's terrorization of D.H. was not the first time Lykken had committed such atrocious acts. Prior to sentencing Lykken, the trial court considered aggravating and mitigating evidence produced at a lengthy sentencing hearing.

Lykken's former wife, C.S. testified about routine beatings she suffered at the hands of Lykken during their marriage. She testified Lykken's "favorite activity" was to choke her. Lykken was very possessive of C.S., refusing to allow her to leave the house. When C.S. found out she was pregnant, Lykken threatened to shoot their one-and-a-half-year-old son and was going to "shoot the baby out of [C.S.'s] stomach." He did shoot, narrowly missing C.S. Lykken also beat their son. Lykken kept C.S. a virtual prisoner in her own home. He often carried a gun. C.S.'s ordeal finally ended when she was rescued by her parents. Despite the rescue, Lykken continued to harass the S. family, at one point assaulting C.S.'s father. Despite the passage of fourteen years, C.S. still has nightmares about her brief but traumatic marriage.

Three other women testified to similar behavior on the part of Lykken. One of those was B.O., whom Lykken was originally charged with raping and kidnapping in 1983. After Lykken threatened to kill B.O., she became a reluctant, uncooperative witness. As a result, most of the charges against Lykken were dropped in exchange for Lykken's guilty plea to burglary.

All of the women's stories were similar in material aspects. Lykken always seemed decent at first. He would approach vulnerable, recently divorced women, and would soon gain their trust. Soon after the relationships began, however, he would become extremely possessive. He would then become extremely abusive, viciously assaulting and often raping his victims and threatening to kill them. Lykken would stalk his victims, terrorizing them and placing them in fear for their lives. At least four women were so terrorized by Lykken they could not prosecute him! All remain traumatized to this day.

Lykken's acts inflicted a high degree of social injury not only on D.H., but also on her children and others. Lykken obviously presents a clear danger to the public, as is established by his pattern of conduct. No remorse has been demonstrated by Lykken indicating a poor prognosis for rehabilitation despite his "great intelligence." Given the severe gravity of the offenses Lykken was convicted of, and given his propensity to commit such atrocious acts, we cannot say Lykken's sentence "shocks the conscience" of this court. Thus, we need not engage in any proportionality review of Lykken's sentence.

We affirm Lykken's conviction and sentence.

MILLER, C.J., concurs.

HENDERSON, J., concurs in part and concurs in result in part.

AMUNDSON, J., concurs in part and dissents in part.

SABERS, J., dissents.

HENDERSON, Justice (concurring in part; concurring in result in part).

In all expressions of law, I concur in this opinion but concur in result only on Issue IV, the legal treatment of the 225 year sentence.

Language on Issue IV does not comport with recent holdings in this Court and the United States Supreme Court. As an example, I note the restrictive language in the *Janssen* cite. All of the emphasis in the majority's treatment of the sentence as being "within the statutory limits" is virtually archaic. Absolute non-reviewability, on such a thesis, is at an end. Notwithstanding, said statement is recited oft-over in South Dakota. Statutory scrutiny is subservient to constitutional scrutiny when sentencing is considered. "The overriding principle is that no sentence is per se constitutional. We hold that felony sentences are subject to Eighth Amendment propor-

tionality review." *State v. Weiker*, 366 N.W.2d 823, 826 (S.D.1985) (citing *Solem v. Helm*, 463 U.S. 277, 288–89, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637, 648 (1983)).

Here, Lykken has a long history of perpetrating violence upon females, including nearly choking them to death. At a mitigation/aggravation hearing, subsequent to his conviction, facts were developed that he would display a gun on different occasions threatening to kill people and would hold them in terror. He threatened to shoot a young boy and at one time assaulted a minister with a club, made from barbed wire, and barricaded the minister in a car. This record discloses a long history of violence by Lykken, including an attempt to kill his own brother with a hatchet; Lykken was characterized as a menace to society. There was testimony that he was a "devilistic person." There were other occasions testified to where Lykken raped other women and these women came forward, during this hearing, to testify that they lived in total fear of him. Obviously, Judge Hertz, who is our senior trial judge in South Dakota and one of the most distinguished and knowledgeable men who ever served the bench in South Dakota, was totally impressed and impacted by this extensive testimony of the demonistic traits of Lykken.

Thus, this sentence should not shock the conscience of men generally. *State v. Bad Heart Bull*, 257 N.W.2d 715, 720 (S.D. 1977). Nor should it shock the conscience of the men who sit on this Court. *State v. Antelope*, 304 N.W.2d 115, 117 (S.D.1981). There are three proportionality criteria under *Solem v. Helm:* (1) the gravity of the offense and the harshness of the penalty; (2) the sentence imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for the commission of the same offense in other jurisdictions. *Weiker, supra* at 825.

I am unable to find any statistics, studies, or data, in this record, on criteria 2 and 3 relative to the *Solem v. Helm* test. Thus, I have no basis upon which to base an informed judgment. However, as an appellate judge, I certainly can consider criteria 1, the gravity of the offense and the harshness of the penalty. This was a grave offense and the penalty is not harsh considering the background of this man. There is a scenario, in this record, almost a handprint crime, depicting that Lykken, at one time, held a knife to a woman's throat and raped her three times over a period of 3½ to 4 hours. "Prolonged confinement?" Restriction on "movement *within* the premises?" Three and one-half to four hours could be an eternity to a victim whose life is, second by second, in question. Under SDCL 22–19–1, Lykken did "confine" after he did "seize" this victim and it was "to facilitate the commission of [a] felony." In my opinion, there was "prolonged confinement" and there was a definite restriction on "movement within the premises." The Board of Pardons and Paroles should secure the transcript of the mitigation/aggravation hearing and file it with Lykken's case, lest the history of Lykken be not lost. Justice has been served in this case.

AMUNDSON, Justice (concurring in part and dissenting in part).

The undisputed facts in this case reveal that Lykken entered D.H.'s residence at nighttime for the purpose of raping D.H. The confinement and multiple rapes all occurred within the residence.

As stated in the majority opinion, this court has previously held that acts merely incidental to a forcible rape are not a sufficient basis upon which a separate conviction for kidnapping can be supported. *State v. Reiman*, 284 N.W.2d 860 (S.D. 1979). This rationale is sound, since it is fairly common to have facts showing some seizure and removal of the victim in any rape prosecution.

In *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976), the court was confronted with a robbery and a kidnapping conviction that occurred outside and inside the business establishment of the victim. The court, in discussing the various decisions on dual convictions, cited to the comments of the American Law Institute and to the kidnapping section of the Model Penal Code which

is listed as a source for SDCL 22–19–1. The comment referred to is as follows:

> The learned draftsmen of the Model Code explain that 'it is desirable to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape, because the broad scope of this overlapping offense has given rise to serious injustice, as well as to distortion of criminal statistics. Examples of abusive prosecution for kidnapping are common. Among the worst is use of this means to secure a death sentence or life imprisonment for behavior that amounts in substance to robbery or rape, in a jurisdiction where these offenses are not subject to such penalties.... The criminologically nonsignificant circumstance that the victim was detained or moved incident to the crime determines whether the offender lives or dies.' (Citations omitted.)

547 P.2d at 728. The court went on to hold in *Buggs* as follows:

> [I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:
>
> (a) Must not be slight, inconsequential and merely incidental to the other crime;
>
> (b) Must not be of the kind inherent in the nature of the other crime; and
>
> (c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.
>
> For example: A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is. *The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not kidnapping; the removal from a public place to a place of seclusion is.* (Emphasis supplied.)

547 P.2d at 731.

The rapes in this case were vicious and brutal, but the question before this court is whether, in addition thereto, a kidnapping occurred. The movement and confinement in the residence has no significance independent of the rape. The movement and confinement in the residence did not make the rapes substantially easier to commit. This confinement in the residence is inherent in the commission of the rapes.

In *Reiman, supra,* the victim was raped repeatedly over a four-hour period inside the paint shop where she had been taken. During this time period, the victim was struck numerous times and managed to get away from her assailants to a bathroom in the shop. She was again returned to the mattress before her release. This court held that the movement of the victim inside this shop by the two defendants, who did not participate in the seizure and removal of the victim from the bar to the shop, was incidental to the commission of forcible rape and did not substantially add to the risk of harm which was present under the evidence submitted. These two defendants' kidnapping convictions were reversed. In this case, the confinement and movement of the victim in her residence was clearly incidental to the rapes that took place over the four-plus hours while defendant remained in the residence and the confinement was solely for the purpose of Lykken's perverted desire to make love to the victim one more time before his demise. In fact, the victim's own testimony is that when returned to the bedroom she was not thrown forcibly onto the bed, but was put back on the bed so that Lykken could continue his sexual assaults. This evidence certainly does not depict a situation where State has proven an increase in risk of harm. Therefore, I would reverse the conviction for kidnapping in accordance with the settled law of *Reiman.*

There was no separate action from the rapes which would support a kidnapping conviction as found to exist by this court in *State v. St. Cloud,* 465 N.W.2d 177 (S.D. 1991) (forced victim to drive to country location at knife point and then removal from automobile to structure where rape occurred); *State v. Reed,* 313 N.W.2d 788 (S.D.1981) (a seizure and removal of the victim from a Rapid City street to rural

Pennington County while holding a knife to the back of the victim); *State v. Curtis,* 298 N.W.2d 807 (S.D.1980) (defendant attempted murder during a forced automobile ride in victim's vehicle).

I do not perceive my rationale for reversing this kidnapping conviction as granting Lykken a free kidnapping in light of the fact that Lykken has received a sentence of one hundred years on his rape conviction and twenty-five years on his burglary conviction, with these sentences to be served consecutively. Thus, the remaining one hundred twenty-five year sentence, which this 37–year–old defendant would serve, still borders on an actual life sentence.

By affirming the kidnapping conviction, Lykken, obviously not a candidate for the man of the year award, has been given a sentence without any hope of life without bars. This sentence dispels any chance for the well-established goals of sentencing to trigger in, to-wit: successful correction, rehabilitation or reformation. This sentence accomplishes only one thing—RETRIBUTION. Allowing the prosecution to prevail on a separate conviction for what I perceive as acts merely incidental to the rape, is condoning abusive prosecution.

In conclusion, I would state that I concur with the majority's holding on Issues I, III and IV insofar as the sentences on the burglary and rape convictions.

SABERS, Justice (dissenting).

A review of the appeal record reveals a jurisdictional defect which is controlling. The time to file a motion for new trial is jurisdictional. SDCL 23A–32–15 provides in part:

An appeal from the judgment must be taken within thirty days after the judgment is signed, attested and filed.

The running of the time for filing a notice of appeal is terminated by a *timely* motion [for new trial]....

(emphasis added). SDCL 23A–29–1, which governs motions for new trial in *criminal* actions, provides in part:

A motion for new trial ... shall be served and filed not later than *ten days after filing of the judgment.*

(emphasis added).

In this case, the record reflects that: 1) Judgment was filed in trial court on February 7, 1991; 2) Motion for new trial was filed in trial court on February 21, 1991; and 3) Notice of appeal was filed in trial court on April 1, 1991. Accordingly, the last date for filing a motion for new trial would have been February 18, 1991, the first business day following the 10th day, which fell on a Sunday. Therefore, the last date for appeal would have been March 11, 1991, the first business day following the 30th day, which fell on a Saturday. Because Lykken's motion for new trial was not made within the 10 days following the filing of the judgment, the appeal time was *not* tolled. As noted above, the appeal was not filed until April 1, 1991. Therefore, we have no choice but to dismiss for lack of jurisdiction. *State v. Waters,* 472 N.W.2d 524, 525 (S.D.1991); *State v. Hare,* 260 N.W.2d 224, 225–26 (S.D.1977).