**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Eric Andrew CASTANEIRA, Defendant and Appellant.**

No. 17869.

Supreme Court of South Dakota.

Considered on Briefs Nov. 19, 1992.

Decided June 23, 1993.

Mark Barnett, Atty. Gen., Ann C. Meyer, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

James E. McMahon of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for defendant and appellant.

SABERS, Justice.

### ACTION

Eric Andrew Castaneira (Castaneira) pled guilty to kidnapping, SDCL 22–19–1(1), a Class 1 felony with a maximum punishment of life imprisonment and a $25,000 fine. SDCL 22–6–1(3). The remaining charges in the indictment—aggravated assault, burglary, commission of a felony while armed—were dismissed. He was sentenced to 100 years in the penitentiary with 30 years suspended on the conditions that he shall: a) "not be within 300 yards of any Midland National Life Insurance Company for Life," b) "have no contact with any present or future employee of Midland National Life Insurance Company for life," and c) "follow parole conditions as to psychiatric counseling."

On appeal, Castaneira contends that the sentence is excessive and violates both the Eighth Amendment to the United States Constitution and Article VI, § 23 of the South Dakota Constitution. We affirm.

### FACTS

Castaneira is a thirty-three year old high school graduate who was honorably discharged from the Air Force. He married in 1979 and has two children, an eight year old daughter and a six year old son. His career has involved sales positions.

In 1984, Castaneira started his own general insurance agency in Maryland and later moved it to Pennsylvania. In 1986, he became a general agent for Midland National Life Insurance Company (Midland), which has its home office in Sioux Falls, South Dakota. Castaneira was an aggressive, successful agent. Between 1986 and 1990, Midland twice awarded his agency the Agency of the Year Award, its second most prestigious award.

In 1989, Castaneira's relationship with Midland deteriorated because Castaneira believed that Midland's insurance and general agents' business standards were improper. Castaneira believed that Midland condoned the submission of life insurance applications that misrepresented the applicant's medical history in order to make

sales easier. Midland, he claimed, would issue the policy and then could later deny coverage because the applicant lied on the application.

Castaneira became obsessed with the matter. He investigated agents and forwarded his findings to Alan Spencer (Spencer), Midland's senior vice president in Sioux Falls. Castaneira believed that Midland ignored his complaints and then attempted to destroy his business by driving a wedge between him, his agents, and his clients. Castaneira then sued Midland, which countersued, in Maryland. When the suit was dismissed with prejudice, Castaneira began writing letters to newspapers, TV stations, and state insurance departments denouncing Midland.

In June 1991, Castaneira began contemplating suicide. He videotaped himself talking about suicide and the improprieties at Midland. Castaneira's wife called the police and then called Spencer, Castaneira's main contact at Midland, to tell him to protect himself. Castaneira's business partner also wrote to Spencer telling him "I think you should be very scared. If he snaps there's no telling what he will do and I don't think he feels he has anything to lose right now."

At 11:30 a.m. on September 3, 1991, Castaneira entered Midland's building in Sioux Falls. He was carrying a semiautomatic pistol pointed toward the ceiling. He threw an envelope on the receptionist's desk and told her to give it to the police. This note told police that Castaneira had taken the Midland Building in an effort to force Midland to admit complicity in a nationwide insurance scam. Castaneira wrote that he did not intend to harm anyone but was quite capable of using any force necessary.

Castaneira, who was familiar with the layout of Midland's building, began running toward Spencer's office. He met Spencer in the hall, ushered him into Spencer's office, closed the door, and asked whether the doors could be locked. When Spencer replied that they could not be, Castaneira had him close the drapes and sit on the couch. Castaneira sat opposite him with the gun on his lap pointed at Spencer. The gun remained pointed at Spencer during the entire ordeal.

Castaneira knew that Spencer had a heart condition. He believed that Spencer was beginning to hyperventilate and used the cellular phone that he brought with him to call 911 to request an ambulance.

Castaneira held Spencer from 11:30 a.m. to 7:15 p.m. During this time he used his cellular phone to contact the media and the police. He told the police that he was not acting impulsively; his actions has been carefully researched and planned. He claimed to have 100 rounds of ammunition in case the police stormed Spencer's office.

Throughout the day, Spencer never knew whether Castaneira would harm him or not. Castaneira decided what Spencer could and could not do. Due to Castaneira's mood swings Spencer considered his life in danger. Spencer attempted to keep their exchange lighthearted since he felt that was the only way he could survive. When Spencer commented that he could get through the door before Castaneira could do anything, Castaneira was serious when he replied "I want you to realize I had target practice last week, that I have hollow point bullets in the gun, and which rib[s] would you like it between[?]" He also told Spencer that if he tried to be "funny" he might not be able to walk out. After his cellular phone service was temporarily cut Castaneira became hostile and told police that "mistakes like that cost lives."

Castaneira negotiated with police, and asked for and received a lawyer, William Janklow, a former governor. At 7:15 p.m. he released Spencer. Castaneira remained in Spencer's office with the gun pointed at his head. Throughout the day he had contemplated suicide so his wife and children could benefit from over a million dollars in life insurance proceeds. He also was afraid that the police would storm the room and wanted to spare the police from killing him. After four hours, however, Castaneira surrendered. Castaneira was taken into custody and charged. He made his appearance and bond was set at $200,000.

During the Christmas holiday, Castaneira was temporarily released from jail on personal recognizance to return to his family in Pennsylvania. Twelve conditions were placed on the release, including allowing Midland to hire security to escort Castaneira and check on him in Pennsylvania. While in Pennsylvania, Castaneira went on television and discussed how Sioux Falls law enforcement overreacted to the hostage situation. Castaneira's bond and furlough were revoked after the Minnehaha County State's Attorney was notified that Castaneira had attempted to acquire a shotgun from a relative in violation of the condition that he not be in possession of a firearm.

## ISSUE

WHETHER THE TRIAL COURT'S 70–YEAR SENTENCE FOR KIDNAPPING WAS EXCESSIVE IN VIOLATION OF THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION AND TO ARTICLE VI, § 23 OF THE SOUTH DAKOTA CONSTITUTION?

Appellate review of sentences in South Dakota in light of the United States Supreme Court's plurality decision in *Harmelin v. Michigan*, 501 U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) was exhaustively reviewed in *State v. Gehrke*, 491 N.W.2d 421 (S.D.1992). *Gehrke* noted that in *Harmelin*,

five justices agreed Michigan's mandatory sentence of life imprisonment without possibility of parole for the offense of possessing 672 grams of cocaine did not constitute cruel and unusual punishment in violation of the Eighth Amendment. Justice Scalia, joined by Chief Justice Rehnquist, concluded the Eighth Amendment contains no proportionality guarantee outside of death penalty cases and, therefore, *Helm* should be overruled. *Id.*, 501 U.S. at ——, 111 S.Ct. at 2696, 115 L.Ed.2d at 858. Justice Kennedy, joined by Justice O'Conner and Justice Souter, recognized in noncapital cases the cruel and unusual punishment clause encompasses a "narrow proportionality principle." *Id.*, 501 U.S. at ——, 111

S.Ct. at 2702, 115 L.Ed.2d at 866. After setting forth four principles gleaned from Supreme Court decisions, Justice Kennedy concluded: "[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate to the crime.'" *Id.* 501 U.S. at ——, 111 S.Ct. at 2705, 115 L.Ed.2d at 869 (quoting *Helm*, 463 U.S. at 288, 303, 103 S.Ct. at 3008, 3016, 77 L.Ed.2d at 647, 657).

Further, Justice Kennedy stated the crime of possession of more than 650 grams of cocaine was of sufficient severity that no comparative analysis was necessary, concluding "intra- and inter-jurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.*, 501 U.S. at ——, 111 S.Ct. at 2707, 115 L.Ed.2d at 871. "The proper role for comparative analyses of sentences, then, is to validate an initial judgment that a sentence is grossly disproportionate to a crime." *Id.* 501 U.S. at ——, 111 S.Ct. at 2707, 115 L.Ed.2d at 872.

491 N.W.2d at 423–424.

*Gehrke* found that *Harmelin* approved our procedure for reviewing sentences and that *Harmelin's* analysis was consistent with our previous decisions. Consequently,

"On appeal, we first determine whether the sentence 'shocks the conscience' or is so disproportionate to the crime that it activates the Eighth Amendment 'within and without jurisdiction' proportionality tests...." State v. Lykken, 484 N.W.2d 869, 879 (S.D.1992); State v. Basker, 468 N.W.2d 413, 418 (S.D.1991). *Accord* State v. Andrews, 393 N.W.2d 76, 82–83 (S.D.1986); *Weiker II*, [State v. Weiker] 366 N.W.2d [823] at 827 [(S.D.1985)]. "Absent a sentence which is so excessive in duration that it shocks the conscience of the court, it is well settled in South Dakota that a sentence within statutory limits is not reviewable on appeal." *Lykken*, 484 N.W.2d at 879; State v. Janssen, 371 N.W.2d 353, 356 (S.D.1985)

(citing cases). Stated alternatively, we will only engage in extensive review of a sentence where we have first determined the sentence was manifestly disproportionate to the crime. State v. Holloway, 482 N.W.2d 306, 310–311 (S.D.1992); *Weiker II,* 366 N.W.2d at 827. "If a sentence is manifestly disproportionate to the crime, [in light of the gravity of the offense and harshness of the penalty].... then the other two factors listed in *Helm* [sentence imposed on others in the same jurisdiction and in other jurisdictions] become more focused and require extensive review." *Weiker II,* 366 N.W.2d at 827. *See also Helm,* 463 U.S. at 292, 103 S.Ct. at 3011, 77 L.Ed.2d at 650.

*Gehrke, supra,* 491 N.W.2d at 423.

Castaneira's sentence is clearly within the statutory limits for the crime of kidnapping. SDCL 22–19–1(1); SDCL 22–6–1(3). He becomes parole eligible in approximately nine years; his good time release date is in thirty seven years. Thus the inquiry becomes whether the sentence shocks the conscience:

> We have set out a two-part test to determine whether a sentence is so constitutionally offensive as to shock the conscience: First, whether the punishment is so excessive or cruel " 'as to meet the disapproval and condemnation of the conscience and reason of men generally[,]' " and second, "whether the punishment is so excessive or so cruel as to shock the collective conscience of this court." State v. Shilvock–Havird, 472 N.W.2d 773, 779 (S.D.1991) (citing [State v.] *Reed,* 451 N.W.2d 409; State v. Phipps, 318 N.W.2d 128 (S.D.1982).

*Id.* 491 N.W.2d at 424.

Castaneira attempts to minimize this crime by stressing his lack of a criminal history, his loving family and successful business, and the lack of physical harm to Spencer since he believes that the only hostage was Midland's building. Because no person was physically injured he argues that the case lacks compelling circumstances warranting a lengthy sentence. He also contends that the sentence forecloses rehabilitation.

Castaneira seriously underestimates, however, the seriousness of the crime and its impact. Castaneira's obsession with Midland and its practices led him to carefully plan the crime even after a Maryland Court dismissed his claims. He entered Midland's building during working hours; employees were evacuated. He held Spencer at gunpoint for eight hours. He was prepared to use any force necessary.

The impact of Castaneira's actions went far beyond Spencer and Midland's building. The record contains letters from Spencer's family and Midland employees and executives detailing the horror they experienced and the long-term effects of Castaneira's actions. Law enforcement spent hundreds of hours in overtime, in addition to regular shifts, during the ordeal. The state's attorney noted, "Our entire community really was held hostage by this defendant." In addition, Castaneira's young children are experiencing problems in school and are in counseling; his wife faces the prospect of not being able to keep their house.

In sentencing Castaneira, the trial court heard a statement read by Castaneira and testimony from his wife and Spencer. It had the benefit of the extensive pre-sentence report. In considering the trial court's sentencing address to Castaneira it is apparent that the trial court's considerations were appropriate and rehabilitation was considered.

Because the sentence does not meet the threshold test of shocking the conscience the issue of proportionality need not be reached.*

Affirmed.

MILLER, C.J., and AMUNDSON, J., concur.

---

* We note in his special concurrence in *State v. Burtzlaff,* 493 N.W.2d 1, 10 (S.D.1992) Chief Justice Miller observed "that at least within binding federal decisional authority, no Eighth Amendment proportionality guarantee continues to exist outside death penalty jurisprudence unless the penalty imposed is grossly disproportionate to the crime. *Harmelin v. Michigan,* 501 U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)."

**116**

HENDERSON, J., concurs specially.

WUEST, J., disqualified.

HENDERSON, Justice (concurring specially).

I stand by my writings in *State v. Gehrke*, 491 N.W.2d 421, 425 (S.D.1992) (Henderson, J., dissenting) and *State v. Holloway*, 482 N.W.2d 306, 311 (S.D.1992) (Henderson, J., concurring in part; dissenting in part), as well as the United States Supreme Court case of *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). (Sentences must be proportionate to the crime, not just within the statutory limits). A sentence within statutory limits is not the sole or governing criteria. However, Castaneira did not present statistics or any other evidence to the trial court to strengthen the issue on which he now appeals. *See State v. Sheridan*, 383 N.W.2d 865, 866 (S.D.1986) (Henderson, J., specially concurring); *State v. Rederth*, 376 N.W.2d 579, 581 (S.D.1985) (Henderson, J., concurring in result). In light of the circumstances that engulfed this dark day, knowing that Castaneira's good behavior could get him released as early as October 18, 2000, means he could achieve one of the chief goals of the criminal justice system: Rehabilitation. *Holloway* at 312. Such a possibility breathes a sigh of relief into his long sentence rather than shocking the conscience.

Inasmuch as the ultimate paragraph of this decision expressed that "the issue of proportionality need not be reached," the footnote, which concludes the writing, is totally moot.