**Richard Norman ST. CLOUD, Petitioner and Appellant,**

v.

**Walter LEAPLEY, Warden of the South Dakota State Penitentiary, Appellee.**

No. 18332.

Supreme Court of South Dakota.

Argued March 21, 1994.

Decided Aug. 31, 1994.

Timothy M. Gebhart, Davenport, Evans, Hurwitz & Smith, Sioux Falls, for petitioner and appellant.

Mark W. Barnett, Atty. Gen. and John P. Guhin, Asst. Atty. Gen., Pierre, for appellee.

WUEST, Justice.

Richard St. Cloud (St. Cloud) appeals from the trial court's order denying his application for writ of habeas corpus. We affirm in part, reverse in part and remand.

## FACTS

St. Cloud is a Native American whose blood quantum is $^{15}\!/_{32}$ Yankton Sioux and $^{7}\!/_{16}$ Ponca Indian Tribe; thus, he is $^{29}\!/_{32}$ Native American. As a child, St. Cloud was enrolled in the Ponca Tribe of Nebraska. In 1962, the U.S. Congress passed legislation terminating the Ponca tribe. Pub.L. No. 87–629 (1962) (entitled "Ponca Tribe of Nebraska: Termination of Federal Supervision" and codified at 25 U.S.C. §§ 971–980). The legislation provided in pertinent part:

When the distribution of tribal assets in accordance with the provisions of this sub-

chapter has been completed, the Secretary of the Interior shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to such tribe and its members has terminated. Thereafter, the tribe and its members shall not be entitled to any of the special services performed by the United States for Indians or Indian tribes because of their Indian status, all statutes of the United States that affect Indians or Indian tribes because of their Indian status shall be inapplicable to them[.]

25 U.S.C. § 980. Approximately twenty-four years after the effective date of termination (1966), Congress restored federal recognition to the Ponca Tribe of Nebraska in 1990. Ponca Restoration Act, Pub.L. 101–484 (1990) (codified as amended at 25 U.S.C. §§ 983–983h). *See generally* Elizabeth S. Grobsmith and Beth R. Ritter, *The Ponca Tribe of Nebraska: The Process of Restoration of a Federally Terminated Tribe,* 51 HUM.ORG. 1–16 (1992) (hereinafter *"Ponca Restoration Process"*).[1] One of the first steps in the restoration process was taken only five years after the effective date of termination when the tribe was once again formed and incorporated in 1971. *Ponca Restoration Process* at 8. In 1986, the Northern[2] Ponca Restoration Committee was formed and subsequently incorporated, receiving non-profit status from the Internal Revenue Service in 1988. *Id.* at 11. In April 1988, the Nebraska legislature passed Resolution # 428 which officially recognized the Ponca tribe, recognized the members as

1. This in-depth article is authored by two anthropologists who were intimately involved in the process of federal restoration of the tribe. An early draft of this paper was presented in October 1989 in Sioux Falls, South Dakota, at the 47th Annual Meeting of the Plains Anthropological Society. *Ponca Restoration Process* at 1.

2. The Northern Ponca tribe, restored as the Ponca Tribe of Nebraska, is differentiated from the Southern Ponca of Oklahoma. The Ponca were all originally from Nebraska and the terms of an 1865 treaty granted them reservation lands encompassing 96,000 acres largely along the Niobrara River. *Ponca Restoration Process* at 5. The Fort Laramie Treaty of 1868 brought a "rude awakening" to the Ponca, as the terms of that treaty ceded all Ponca reservation lands to the Sioux territory, without consulting the Ponca.

*Id.* In 1877, the Ponca were directed to remove themselves to Indian territory in Oklahoma. The involuntary move, known as the "Ponca Trail of Tears," resulted in the death of one-third of the tribal members. *Id.* at 5–6. Following an investigation of the injustices imposed on the Ponca, Congress later allowed those who desired to attempt to re-establish themselves on the homeland along the Niobrara River. Approximately 600 Ponca remained in Oklahoma and became known as the Southern Ponca; while a smaller group (approximately 225) became known as the Northern Ponca. *Id.* at 6. This was the group that was eventually terminated as a tribe in 1962 during the period when "federal Indian policy was aimed at the assimilation of American Indians into mainstream society." *Id.* at 7.

American Indians, and supported efforts for federal restoration. *Id.* The Ponca Restoration Act provides that the membership roll includes the names of those individuals listed on the published membership roll at the time of termination. 25 U.S.C. § 983e (referring to the membership roll published at 25 Fed. Reg. 8235 (June 26 1965)). That published final roll includes the name of Richard Norman St. Cloud "as a male born October 27, 1947 who is ⁷⁄₁₆ Ponca." *See St. Cloud v. United States,* 702 F.Supp. 1456, 1463 (D.S.D.1988) (*St. Cloud I*) (citing 31 Fed. Reg. 8235). Thus, St. Cloud is presently a member of the Ponca Tribe of Nebraska. The Ponca Restoration Act provides that, "All rights and privileges of the Tribe which may have been abrogated or diminished before October 31, 1990, by reason of [the termination act] are hereby restored and such law shall no longer apply with respect to the Tribe or the members." 25 U.S.C. § 983b.

In 1983, during the interim period when the Ponca tribe was terminated, St. Cloud applied for enrollment in the Yankton Sioux Tribe based on his ¹⁵⁄₃₂ Yankton Sioux blood quantum. Due to a provision in the Yankton Sioux tribal constitution, he was ineligible for enrollment because he had been enrolled in the terminated Ponca tribe. *St. Cloud I,* 702 F.Supp. at 1458 n. 6. St. Cloud was married to an enrolled member of the Lower Brule Sioux Tribe, lived on the Lower Brule Reservation from 1973 until 1986, and had several children enrolled as tribal members. Because St. Cloud was not an enrolled tribal member he did not receive general federal assistance; but did obtain treatment under the federal Indian Health Services program and likewise received several benefits of tribal affiliation. *St. Cloud I,* 702 F.Supp. at 1461–62.

In April 1986, St. Cloud was charged with the kidnapping and rape of a non-Indian woman within the exterior boundaries of the Lower Brule Reservation. For a statement of the facts surrounding this incident, *see*

*State v. St. Cloud,* 465 N.W.2d 177, 178 (S.D. 1991) (*St. Cloud II* ). St. Cloud pled guilty in federal district court to a reduced charge of involuntary sodomy under the Major Crimes Act, a federal law that authorizes jurisdiction over Indians charged with certain crimes committed in Indian country. 18 U.S.C. § 1153.[3] Following sentencing to a federal penitentiary, St. Cloud filed a motion in which he argued that the federal district court lacked jurisdiction to convict him. Specifically, St. Cloud argued that because he was enrolled in a terminated tribe, he was not an "Indian" for purposes of federal criminal jurisdiction. Although the federal district court found that St. Cloud is "virtually a full-blooded Native American" and "obviously is ethnically an Indian," the federal court found that St. Cloud was not subject to federal criminal jurisdiction under the circumstances of the case, and ordered St. Cloud released from federal prison to the custody of the attorney general of the State of South Dakota. *See St. Cloud I,* 702 F.Supp. at 1460–66.

St. Cloud subsequently pled not guilty in state court to charges of first-degree rape and kidnapping. His trial took place in Lyman County where the Lower Brule Reservation is located. In December 1989, a jury found him guilty on both counts and he was sentenced to the South Dakota State Penitentiary. St. Cloud's conviction was affirmed on direct appeal to the South Dakota Supreme Court. *St. Cloud II,* 465 N.W.2d at 182. Additional facts are noted within this opinion as necessary.

St. Cloud applied for a writ of habeas corpus, alleging that he is unlawfully imprisoned and detained by the warden of the penitentiary due to his conviction on the rape and kidnapping charges. The circuit court issued its memorandum opinion, findings of fact, conclusions of law, and order denying St. Cloud's application. This appeal follows.

---

**3.** The statute provides in pertinent part: "Any *Indian* who commits against the person or property of another Indian or other person any of the following offenses [including kidnapping and rape] within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." 18 U.S.C. § 1153(a) (1994) (emphasis added). The term "Indian" is undefined.

## STANDARD OF REVIEW

This court has stated on numerous occasions that "in habeas corpus proceedings, the *scope* of review is limited because the remedy sought is in the nature of a collateral attack upon a final judgment." *Aliberti v. Solem,* 428 N.W.2d 638, 639 (S.D.1988); *Satter v. Solem,* 422 N.W.2d 425, 427 (S.D.1988) (*Satter II*); *Everitt v. Solem,* 412 N.W.2d 119, 120–21 (S.D.1987); *Podoll v. Solem,* 408 N.W.2d 759, 760 (S.D.1987); *Goodroad v. Solem,* 406 N.W.2d 141, 142 (S.D.1987); *Loop v. Solem,* 398 N.W.2d 140, 143 (S.D.1986); *In re Williams,* 86 S.D. 208, 210, 193 N.W.2d 793, 794 (1972); *In re Kiser,* 83 S.D. 272, 283, 158 N.W.2d 596, 602 (1968); *State ex rel. Burns v. Erickson,* 80 S.D. 639, 645, 129 N.W.2d 712, 715 (1964); *State ex rel. Anderson v. Jameson,* 51 S.D. 540, 545, 215 N.W. 697, 699 (1927). " '[H]abeas corpus can be used only to review (1) whether the court had jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) in certain cases, whether an incarcerated defendant has been deprived of basic constitutional rights.' " *Aliberti,* 428 N.W.2d at 640 (citing *Satter II,* 422 N.W.2d at 427; *Goodroad,* 406 N.W.2d at 144; *Burns,* 80 S.D. at 645, 129 N.W.2d at 715). " 'For purposes of habeas corpus, constitutional violations in a criminal case deprive the trial court of jurisdiction.' " *Satter v. Solem,* 458 N.W.2d 762, 765 (S.D. 1990) (*Satter IV*) (quoting *McCafferty v. Solem,* 449 N.W.2d 590, 591–92 (S.D.1989) (citations omitted)).

We have also described the range of issues proper for review in a habeas corpus action:

Although habeas corpus is not a substitute for direct appeal, appellant may assert jurisdictional errors which render the first judgment void. In the context of habeas corpus, jurisdictional error is given an expansive construction. Of course, this includes personal and subject matter jurisdiction, but due process violations and compliance with substantive statutory procedures are also subject to challenge in habeas corpus proceedings.

*Security Savings Bank v. Mueller,* 308 N.W.2d 761, 762–63 (S.D.1981) (citations omitted). *See State ex rel. Smith v. Jameson,* 80 S.D. 333, 335, 123 N.W.2d 300, 301 (1963) (stating that habeas corpus actions deal with such defects, "as render the proceeding or judgment absolutely void"); *State ex rel. Ruffing v. Jameson,* 80 S.D. 362, 366, 123 N.W.2d 654, 656 (1963) (noting that claims of error and irregularities that may have been grounds for reversal on direct appeal are not properly reviewable in habeas proceedings; but "those actions in which the court may lose jurisdiction by a denial of due process" are properly reviewable in habeas).

This court explicitly delineated the *standard* of review for findings of fact and conclusions of law arising out of habeas corpus proceedings in *Aliberti,* 428 N.W.2d at 640. Looking to the federal courts for guidance, we noted that a lower court's findings of basic, primary facts are given "considerable deference" and stated that "[s]uch findings of fact will not be set aside unless they are clearly erroneous." *Id.* (citing *Blackburn v. Foltz,* 828 F.2d 1177, 1181 (6th Cir.1987); *Carter v. Rafferty,* 826 F.2d 1299, 1304 (3rd Cir.1987); *Butcher v. Marquez,* 758 F.2d 373, 376 (9th Cir.1985); *Meeks v. Bergen,* 749 F.2d 322, 327 (6th Cir.1984); *United States v. Auerbach,* 745 F.2d 1157, 1161 (8th Cir.1984); *Hayes v. Maggio,* 699 F.2d 198, 201 (5th Cir.1983)). Further, the *Aliberti* court noted:

Although the lower court's findings of fact are presumed to be correct, this presumption of correctness does not extend to the conclusions drawn from the application of legal principles to those factual findings. Applying legal principles to findings of fact creates mixed questions of law and fact. Federal courts will review mixed questions of law and fact de novo, giving deference to factual findings but reserving the right to give different legal weight to the facts. [Citations omitted.] We are persuaded that this same standard of review applied by the federal courts should also apply in this court's review of a circuit court's habeas ruling, particularly when that ruling involves claims based on ineffective assistance of counsel. Whether a defendant has received ineffective assistance of counsel is essentially a mixed question of law and fact. In the absence of a clearly erro-

neous determination by the circuit court, we must defer to its findings on such primary facts regarding what defense counsel did or did not do.... This court, however, may substitute its own judgment for that of the circuit court as to whether defense counsel's actions or inactions constituted ineffective assistance of counsel. *Aliberti,* 428 N.W.2d at 640.

## I. DOES THE STATE OF SOUTH DAKOTA HAVE JURISDICTION OVER THE CRIMINAL CHARGES AGAINST ST. CLOUD?

■ As previously stated, St. Cloud was originally charged and pled guilty in federal court. After sentencing, he urged that the judgment be vacated on the ground that the federal court had no jurisdiction over him under the Major Crimes Act. *See St. Cloud I,* 702 F.Supp. at 1458–66. The federal district court agreed, and St. Cloud was released from the federal penitentiary and subsequently charged, tried and convicted in South Dakota state court. *See St. Cloud II,* 465 N.W.2d at 178. St. Cloud (with new counsel in this habeas proceeding) now urges that proper jurisdiction was in the federal court, and that the state court lacked jurisdiction over him.

In habeas corpus actions an "appellant may assert jurisdictional errors which render the first judgment void. In the context of habeas corpus, jurisdictional error is given an expansive construction. Of course, this includes personal and subject matter jurisdiction[.]" *Security Savings Bank,* 308 N.W.2d at 762–63 (citations omitted). Habeas corpus proceedings may deal with such defects, "as render the proceeding or judgment absolutely void." *Smith,* 80 S.D. at 335, 123 N.W.2d at 301.

■ We are here presented with a singularly unique case where the U.S. District Court for the District of South Dakota has previously considered the question of whether St. Cloud is an "Indian" for purposes of federal criminal jurisdiction. This required the federal court to interpret and apply federal statutes. *St. Cloud I,* 702 F.Supp. at 1457–66. At least two members of this court considered the federal court's decision to be "questionable." *St. Cloud II,* 465 N.W.2d at 179 n. 2. However, "with respect to what is essentially a federal question, we are guided and bound by federal statutes and decisions of the federal courts interpreting those statutes." *Desmarais v. Joy Mfg. Co.,* 130 N.H. 299, 538 A.2d 1218, 1220 (1988) (regarding interpretation of federal ERISA law, and citing 29 U.S.C. §§ 1132, 1144). Other courts have likewise noted that they are "bound by the decisions of the federal courts in their interpretation of a federal statute." *First Nat'l Bank of Ariz. v. Carruth,* 116 Ariz. 482, 569 P.2d 1380, 1381 (App.1977) (regarding federal venue provisions, and citing 12 U.S.C. § 94) (citing *People v. Heidelberg,* 33 Ill.App.3d 574, 338 N.E.2d 56 (1975); *Penbrook Hauling Co. v. Sovereign Constr. Co.,* 128 N.J.Super. 179, 319 A.2d 277 (1974); *Hobbs Lumber Co. v. Shidell,* 42 Ohio Misc. 21, 326 N.E.2d 706 (1974); *Ford v. Wisconsin Real Estate Exam. Bd.,* 48 Wis.2d 91, 179 N.W.2d 786 (1970), *cert. denied,* 401 U.S. 993, 91 S.Ct. 1229, 28 L.Ed.2d 530 (1971)). *See also Ex parte Gurganus,* 603 So.2d 903, 906 (Ala.1992) wherein that court stated:

> Federal decisional law interpreting a federal statute ... and delineating the rights and obligations thereunder is binding on this Court under the Supremacy Clause of Article VI of the United States Constitution: 'This Constitution, *and the laws of the United States which shall be made in pursuance thereof* ..., shall be the supreme law of the land; and the judges in every state shall be bound thereby; anything in the Constitution or laws of any state to the contrary notwithstanding.' (Emphasis added).

*Id.* (quoting U.S. Const. art. VI). This is *not* to be confused with other situations where we look to federal courts for guidance in interpretation of a state statute that is similar to a federal law—where we are *not* bound by lower federal court interpretations. *See e.g., Sander v. Geib, Elston, Frost Prof. Ass'n,* 506 N.W.2d 107, 122–23 (S.D.1993) ("Though federal interpretations of federal civil and appellate procedural rules are not binding on us in an interpretation of like rules in our State's courts, it is appropriate

to 'turn to the federal court decisions for guidance in their application and interpretation.'") (citing *Wilson v. Great N. Ry. Co.*, 83 S.D. 207, 211, 157 N.W.2d 19, 21 (1968); *Brasel v. Myers*, 89 S.D. 114, 116, 229 N.W.2d 569, 570 (1975)). *See also State v. Woods*, 361 N.W.2d 620, 622 (S.D.1985); *National Sur. Corp. v. Shoemaker*, 86 S.D. 302, 310, 195 N.W.2d 134, 139 (1972).

Thus, in light of the determination made by the federal court, interpreting federal law in *St. Cloud I*, we accept that court's holding that for purposes of federal criminal jurisdiction under the Major Crimes Act, St. Cloud is not an "Indian" as required by that federal law. The State of South Dakota properly has jurisdiction over the criminal charges against St. Cloud.

## II. WAS ST. CLOUD'S CONSTITUTIONAL RIGHT TO A JURY COMPRISED OF A FAIR CROSS–SECTION OF THE COMMUNITY VIOLATED DUE TO THE COMPOSITION OF THE LYMAN COUNTY JURY PANELS?

■ One the issues raised by St. Cloud in this habeas corpus action is that he was deprived of a fair trial because the jury panel did not include a fair cross-representation of Native Americans. St. Cloud argues that Lyman County's population is approximately 29% Native American; yet the 200–person master jury list was only 9.2% Native American. Throughout the lower court proceedings, the warden of the penitentiary (hereinafter Warden) urged that St. Cloud lacked standing to challenge the jury panel make-up because St. Cloud is "not an Indian"; the circuit court agreed. For the first time, in this appeal, the Warden argues that St. Cloud did not preserve the issue for appeal because he failed to challenge the jury make-up at the time of the rape and kidnapping trial. St. Cloud counters that since the Warden did not raise this affirmative defense in his pleadings at the habeas trial court level, the defense is waived. We disagree with the lower court's finding that St. Cloud lacked standing to challenge the jury panel make-up; and further find that St. Cloud's challenge is not procedurally barred by waiver.

Several cases speak to the question of waiver. The first is *Reese v. Nix*, 942 F.2d 1276 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1220, 117 L.Ed.2d 457 (1992). *Reese* is a federal habeas corpus action originating in Iowa; Nix is the penitentiary warden. Nix argued, "that Reese defaulted on his claim of self-representation because he failed to raise the issue on direct appeal." 942 F.2d at 1280. Thus, Nix took the position that Reese was procedurally barred from raising the issue in his federal habeas petition. The Eighth Circuit disagreed with Nix, and affirmed the holding of the district court, "that Nix waived his procedural default defense by failing to affirmatively assert it in his answer to Reese's petition for habeas relief." *Id.*

The Seventh Circuit faced a similar issue in *United States ex rel. Blackwell v. Franzen*, 688 F.2d 496 (7th Cir.1982), *cert. denied*, 460 U.S. 1072, 103 S.Ct. 1529, 75 L.Ed.2d 950 (1983). In this habeas corpus action, the court held that, "[w]aiver based on *Wainwright* is an affirmative defense which must be set forth in the responsive pleading. If the respondent [warden] answers on the merits without relying on *Wainwright*, the district court may treat the 'contemporaneous objection' defense as waived." 688 F.2d at 502 (referring to *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)). The court of appeals also commented on what was termed a "distressing phenomenon" it had recently observed: "'It almost seems as though state defendants do not take the prospect of losing habeas petitions with real seriousness until that in fact occurs, only then devoting full attention to issues and arguments that should have been posed in the first instance.'" *Id.* (quoting *United States ex rel. Cosey v. Wolff*, 526 F.Supp. 788 (N.D.Ill.1981)). *See also People v. Harris*, 129 Ill.2d 123, 135 Ill.Dec. 861, 544 N.E.2d 357, 378 (1989), *cert. denied*, *Harris v. Illinois*, 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990). In *Harris*, the Illinois Supreme Court noted that:

> [T]he State did not raise the issue of the timeliness of defendant's objection to the State's use of peremptory challenges when defendant initially filed its pretrial motion

for a mistrial, but instead challenged the motion solely on its factual merits.... We therefore conclude that the State has waived its argument that defendant's objection to the State's exercise of peremptory challenges was untimely.

*Id.* (citing *Lee v. State,* 747 S.W.2d 57, 58 (Tex.App.1988); *People v. Colley,* 173 Ill. App.3d 798, 123 Ill.Dec. 678, 528 N.E.2d 223 (1988)). Thus, we hold that the Warden has waived the affirmative defense that St. Cloud's objection to the jury panel is untimely.

■ In Conclusion of Law IV, the lower court stated in part that, "since [St. Cloud] is not an Indian he has no standing to complain about underrepresentation of Indians on the master jury list, the jury panel or the jury selected." This conclusion was based on the court's Finding of Fact IV, which states that, "Both the Federal Court and the State Court have resolved the issue and have found that he is not an Indian." This statement is inaccurate and misreads the federal court's opinion. Rather, the federal district court made the following statements: "As a virtually full-blooded Native American, St. Cloud obviously is ethnically an Indian. He is socially recognized and lives as a Native American." 702 F.Supp. at 1458. "St. Cloud is socially recognized as an Indian." *Id.* at 1462. "The factors analyzed above guide this Court to conclude that, under the *Rogers* analysis of the meaning of 'Indian' and *apart from determining the effect of termination on St. Cloud's status, St. Cloud is an Indian.*" *Id.* (emphasis added). Further, this court clearly noted that the nature of St. Cloud's claim was that he was not *"an Indian for purposes of federal criminal jurisdiction."* 465 N.W.2d at 178 (emphasis added). At no time did either the federal district court, or this court determine that St. Cloud is not an Indian in a racial, ethnic, or blood quantum context; and race and ethnicity—not political or legal status—are the bases of St. Cloud's challenge to the composition of a jury panel. *See generally* Hiroshi Fukurai et al., Race and the Jury: Racial Disen-

FRANCHISEMENT AND THE SEARCH FOR JUSTICE (1993). The record shows that St. Cloud's blood quantum is $^{29}/_{32}$ Native American. He cannot be racially classified as anything other than an Indian.[4]

■ More importantly, we must emphasize that St. Cloud's racial classification as a Native American has no bearing on his standing to challenge the composition of the jury panel. The requirement that a jury be made up of a fair cross-section of the community is a right of all defendants, whether or not the defendant is a member of the excluded group. The U.S. Supreme Court has held, for example, that a male defendant may challenge the exclusion of women from the jury panel, and a white defendant may challenge the exclusion of blacks from the jury panel. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). In *Taylor,* the Court noted:

> The State first insists that [the defendant], a male, has no standing to object to the exclusion of women from his jury. But [the defendant's] claim is that he was constitutionally entitled to a jury drawn from a venire constituting a fair cross section of the community and that the jury that tried him was not such a jury[.] ... [The defendant] was not a member of the excluded class; *but there is no rule that claims such as [the defendant] presents may be made only by those defendants who are members of the group excluded from jury service.*

*Taylor,* 419 U.S. at 526, 95 S.Ct. at 695, 42 L.Ed.2d at 695 (emphasis added). In *Peters* (a habeas corpus action), the Court stated:

> When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do,

4. As previously noted, at the time of St. Cloud's 1989 trial, the Ponca Tribe of Nebraska was well on its way to achieving restoration of federal recognition; and the 1988 Nebraska legislature

had already officially recognized the tribe and its members as Native Americans. *Ponca Restoration Process* at 8–11.

that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.... Accordingly, *we hold that, whatever his race, a criminal defendant has standing* to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law.

*Peters,* 407 U.S. at 503–04, 92 S.Ct. at 2169, 33 L.Ed.2d at 94–95 (emphasis added). The Court recently reaffirmed these holdings, stating: "[O]ur cases hold that the Sixth Amendment entitles every defendant to object to a venire that is not designed to represent a fair cross section of the community, whether or not the systematically excluded groups are groups to which he himself belongs." *Holland v. Illinois,* 493 U.S. 474, 477, 110 S.Ct. 803, 805, 107 L.Ed.2d 905, 914 (1990). Thus, even if St. Cloud were not ²%₃₂ Native American, he would have standing to challenge the composition of the jury panels in Lyman County.

This court has recognized these concepts. *State v. Hall,* 272 N.W.2d 308 (S.D.1978). In *Hall* we stated:

[T]he Sixth Amendment, as applied to the states by the Fourteenth Amendment, requires that all state petit juries must be selected at random from a fair cross-section of the community. The South Dakota legislature had adopted a statute which provides a similar requirement:

'It is the policy of the state of South Dakota that all litigants in the courts of this state entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community in the municipality, district or county where the court convenes....' SDCL 16–13–10.1.

It is apparent that the burden is now upon the judiciary, not only to prevent purposeful discrimination against minorities but *to insure that all identifiable groups in the community are fairly represented on jury panels.... It is not important whether the underrepresentation is purposeful or not,* nor whether it arose

from the selection of the jury panel or after through the granting of statutory exemptions or excuses.... '(However), if a substantial threat is posed to the representative nature of the jury pool because of constitutionally granted excuses, *then supplemental names must be added to correct any gross imbalance.'*

272 N.W.2d at 310 (second emphasis original) (quoting *United States v. Armsbury,* 408 F.Supp. 1130, 1135 (D.C.Or.1976)). *See Hall,* 272 N.W.2d at 311 n. 1 ("Trial judges may avoid these challenges by supplementing any jury panel where an identifiable group is underrepresented by fifteen percent or more."). *See also State v. Lohnes,* 432 N.W.2d 77, 84 (S.D.1988) ("An 'inherent' exclusion of Indians from the jury selection process may also be found with statistical evidence showing that the voting list results in an underrepresentation of Indians. [Citation omitted.] If underrepresentation is shown, fairness requires supplementation of the jury panel.").

We hold that since St. Cloud's challenge to the jury panel is not procedurally barred, and he does possess standing to make such a challenge, the merits of his claim must be reached. However, because the lower court failed to fully consider the merits of the claim, there are no findings of fact and conclusions of law for this court to review. "A failure to make a finding on a disputed material issue requires a reversal of a judgment." *Bell v. Midland Nat'l Life Ins. Co.,* 78 S.D. 349, 359, 102 N.W.2d 322, 327 (1960) (citing *Craigo v. Craigo,* 22 S.D. 417, 423, 118 N.W. 712 (1908)). "Specific findings may well be the deciding factor of an appeal." *Knodel v. Board of County Comm'r of Pennington County,* 269 N.W.2d 386, 390 (S.D.1978). Since the habeas court's finding on standing prevented it from considering the merits of the claim, it is appropriate for us to remand this matter so that the lower court may take any necessary additional evidence and enter specific findings of fact and conclusions of law on this issue. *Satter v. Solem,* 434 N.W.2d 725, 728 (S.D.1989) (remanding to habeas court to consider implications of involuntary admissions). *See Gregory v. State,* 325 N.W.2d 297, 300 (S.D.1982) (remanding

for entry of specific findings and conclusions on enumerated issues); *Gregory v. Solem,* 420 N.W.2d 362, 363–64 (S.D.1988) (holding that petitioner is entitled to an evidentiary hearing on issues raised).

### III. DID ST. CLOUD RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL?

In evaluating ineffective assistance of counsel claims, this court has adopted and applies the test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Luna v. Solem,* 411 N.W.2d 656 (S.D.1987). This two-step test requires the petitioner to first show that his counsel's performance was deficient. To satisfy this prong, petitioner must prove that "his counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Phyle v. Leapley,* 491 N.W.2d 429, 432 (S.D.1992). In *Strickland,* the U.S. Supreme Court noted:

No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.... Judicial scrutiny of counsel's performance must be highly deferential.... Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

*Strickland,* 466 U.S. at 688–90, 104 S.Ct. at 2065–66. Even if the petitioner can satisfy the first *Strickland* prong, he must then show that counsel's error had an effect on the judgment, that is, that the defense was prejudiced by counsel's deficient performance.

'Prejudice exists when there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The burden of proving prejudice rests upon the defendant. The defendant must overcome the strong presumption that counsel was competent.'

*Petrilli v. Leapley,* 491 N.W.2d 79, 85 (S.D. 1992) (quoting *Ashker v. Solem,* 457 N.W.2d 473, 476 (S.D.1990)).

St. Cloud's claim of ineffective assistance of counsel is based on a number of claimed errors, which we consider in turn.

*1. Failure to examine the tribal court file.*

■ St. Cloud alleges that his counsel failed to examine a tribal court file which would have revealed information vital to his defense. A review of certain facts is necessary to an understanding of this allegation. St. Cloud had a history of alcohol abuse, had been in treatment on a number of occasions, and had periods of sobriety. He had previously been in a treatment program at the tribal alcoholic treatment center in Lower Brule. On the date of the alleged rape (April 16, 1986) St. Cloud came to the tribal alcoholic treatment center and spoke to a counselor he knew there—the victim (J.M.). St. Cloud had been scheduled to go to treatment in Omaha, but had failed to show up. St. Cloud talked to J.M. about getting him to the Omaha treatment center. St. Cloud told J.M. that there was a "warrant" out for St. Cloud's arrest because he had not gone to treatment,[5] and that the police would be looking for him. J.M. was unable to arrange for St. Cloud to get to Omaha on short notice, and offered to drive St. Cloud to a friend's house. The friend was not home, so St. Cloud directed J.M. to drive him to a remote area of the Lower Brule Indian Res-

---

5. The record shows that St. Cloud had been sentenced to 20 days in jail for assault of his wife. However, the tribal judge had said that if he would go to alcohol treatment in Omaha, that St. Cloud could avoid going to jail.

ervation known as "Iron Nation." At some point during the drive, J.M. testified that she wanted to turn around and go back to Lower Brule village, but that St. Cloud ordered her to keep driving. St. Cloud's version was that J.M. took him to Iron Nation willingly, and engaged in consensual intercourse with him in an abandoned house. J.M. testified that St. Cloud brandished a knife, and that it was out of fear that she did not resist. (The knife described by J.M. was never recovered.) Following the rape, J.M. departed alone in her car. St. Cloud testified that he stayed at the house because it was his understanding that J.M. was going to make some phone calls to arrange for him to go to the Omaha treatment center; and by staying at the abandoned Iron Nation house, he would avoid arrest on the outstanding "warrant." J.M. went to the home of an acquaintance, called the police and reported a rape. When the tribal police arrived at the area of the abandoned house, St. Cloud saw the police car, ran over to a nearby church and hid in the attic, which is where the police found him. St. Cloud testified that the reason he hid when the police arrived was because he had been told by the tribal judge (earlier that day) that there was an outstanding "warrant," and that he did not think the police were there to arrest him for some *other* crime (rape).

At trial, St. Cloud's counsel called the tribal judge and questioned her about the "alternate sentence" (jail time or alcohol treatment). The tribal judge testified at trial that she could not "remember, you know, whether the jail sentence was still hanging" as of the date of the alleged rape. On cross-examination of the tribal judge by the prosecution, the following exchange took place:

Q: Mrs. Flute, as of April 16th then, you had given Richard some time on a sentence?

A: Yes.

Q: You didn't have any warrants out for him or anything like that?

A: No.

Q: You weren't planning on slamming him in jail the next day or anything[?]

A: No, usually when they talk to me, I don't do it.

This testimony clearly undermined St. Cloud's story that he understood there was a warrant out for his arrest, and that was why he was hiding.

St. Cloud's defense counsel had not examined the tribal court file to see if there was, in fact, any warrant outstanding on April 16, 1986. Had the court file been examined a document with the following pertinent language would have been discovered:

COURT ORDER—JAILKEEPER

TO THE KEEPER OF THE JAIL AT THE LOWER BRULE POLICE DEPARTMENT: Your [sic] are hereby ordered to take the following action:

FINAL COMMITMENT The Defendant has been found guilty of violating Section 1–3–1a of the Lower Brule Sioux Tribe Penal code and is hereby sentenced to 20 days in jail. The sentence is to commence on the 4th day of April, 1986, at 8:00 A.M. and end on the 23rd day of April, 1986, at 8:00 P.M.

Richard was given time to allow him to seek treatment at an alcoholic Treatment center preferably in Omaha, Neb. If he doesn't go as stated then he would have to serve the time in confinement.

St. Cloud argues that the result of the conflicting testimony at trial regarding whether a "warrant" existed was that "the case became not just St. Cloud's word against the alleged victim's, but also the word of a tribal judge. If anything, the tribal judge destroyed St. Cloud's credibility at a decisive time. Moreover, this destruction came because of St. Cloud's own counsel." It does appear that the testimony of the tribal judge served to undermine St. Cloud's credibility. At the habeas trial, defense counsel admitted that the documentary evidence found in the tribal court file would tend to support St. Cloud's reason for why he hid.

We have held that, "the right of an accused to the services of an attorney envisages that his attorney will investigate and consider possible defenses." *Miller v. State*, 338 N.W.2d 673, 677 (S.D.1983) (citing *State v. Walker*, 287 N.W.2d 705, 706 (S.D.1980); *State v. Pieschke*, 262 N.W.2d 40, 46 (S.D.

---

1978)).[6] "[F]ailure on the part of counsel to conduct the necessary investigation into the facts may result in such prejudice as to justify the granting of relief." *Walker v. Solem*, 648 F.2d 1188, 1189 (8th Cir.1981) (citations omitted).[7] Our review of this record causes us to agree that St. Cloud's defense counsel should have made an investigation into whether or not a warrant (or similar document) existed. As pointed out by St. Cloud, his defense counsel did travel to Lower Brule to interview potential witnesses; it would have taken little additional effort to examine the tribal court file. The failure to make this investigation was not the result of reasonable professional judgment, thus satisfying the first prong of *Strickland*.

However, this omission by counsel fails to satisfy the second *Strickland* prong—that the defense was prejudiced by counsel's deficient performance. *See Petrilli*, 491 N.W.2d at 85. We agree that had the "COURT ORDER—JAILKEEPER" document been discovered and offered at trial, this would have bolstered St. Cloud's credibility as to why he did not flee (but did hide) on the date of the alleged crime. However, admission of the document could also have brought prejudice against St. Cloud. This is because the document shows that he was "found guilty of violating" a section of the Lower Brule penal code, and that would have opened the door to the fact that he had assaulted his wife. This would have amounted to "other bad acts" type evidence, capable of leading the jurors to believe that St. Cloud was a man who had a propensity to be violent against women. This alone would have been very damaging

to St. Cloud's defense. Thus, St. Cloud has failed to show that the result of the proceeding would have been different if his trial counsel had investigated the tribal court file.

### 2. Failure to introduce victim's medical records.

■ Following the time of the alleged rape in 1986, J.M. was taken to a hospital in Pierre where she was examined by a physician and standard "rape kit" evidence was gathered. St. Cloud pled guilty in federal court to reduced charges, so the evidence was not used. In 1989, when St. Cloud was tried in state court, his defense counsel was told that all physical evidence had been destroyed.[8] St. Cloud points out that his defense failed to introduce J.M.'s medical records which showed no sign of force, did not call the physician who had examined J.M., and additionally made no issue before the jury of the fact that no physical evidence of any type existed. As explained by St. Cloud's defense counsel at the habeas trial, since St. Cloud's defense was based on consent, he did not think it was important to pursue whether any copies of J.M.'s medical records remained in existence, or to focus on the issue of lack of physical evidence.

As to this allegation by St. Cloud, in regard to his ineffective assistance of counsel claim, the habeas court stated in finding of fact IX:

> That the victim's medical records were destroyed by the FBI after St. Cloud pled guilty of Federal Court and there were no

---

**6.** *See Miller*, 338 N.W.2d at 677 n. 5: "The American Bar Standards states: 'It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty.' American Bar Association Standards, The Defense Function § 4.1 (1971)."

**7.** *See Walker*, 648 F.2d at 1189 n. 2:

We are not unmindful of the observation of the Supreme Court of South Dakota 'that defense counsel had many years experience as a practicing attorney and was particularly successful as a criminal defense lawyer.' *State v. Walker*, 287 N.W.2d 705, 706 (S.D.1980). *Cf. United States v. DeCoster*, 487 F.2d 1197, 1202 n. 21 (D.C.Cir.1973) ('It is important to stress that

the issue in ineffectiveness cases is not a lawyer's culpability, but rather his client's constitutional rights. [citations omitted] Even the best attorney may render ineffective assistance, often for reasons totally extraneous to his or her ability.').

**8.** This included a knife that had been recovered. J.M. had described a kitchen or paring-type knife wrapped with white tape as the knife with which she had been threatened by St. Cloud. No weapon matching that description was ever recovered. Police later found a folding-type knife on the rear floor of the car in which St. Cloud had been transported. In his habeas trial testimony, St. Cloud's defense counsel called the recovered knife "radically different" from the knife described by J.M.

other useful records and the State did not introduce physical or medical evidence that there was force.

We have stated that "lack of consent by a victim in a rape case is not established solely by showing physical resistance by the victim. The element of compulsion can be satisfied by showing that the victim submitted out of fear of violence or injury." *State v. Gallipo,* 460 N.W.2d 739, 743 (S.D.1990) (citing *State v. Blalack,* 434 N.W.2d 55, 60 (S.D.1988)). At St. Cloud's trial, the State did not present evidence of physical resistance, but did present evidence that J.M. submitted out of fear of violence or injury. That evidence consisted of the testimony of J.M.

We are convinced that the decision of St. Cloud's trial counsel to not pursue physical evidence issues was a tactical decision. This was reasonable in light of the fact that St. Cloud's defense was consent of the victim, and the State offered no evidence of physical resistance. "On review, it is not this court's function to second-guess tactical decisions of defense counsel at trial; this court will not substitute its own theoretical judgment for that of counsel." *Miller,* 338 N.W.2d at 678 (citing *State v. McBride,* 296 N.W.2d 551, 553 (S.D.1980)). This tactical decision does not constitute ineffective assistance of counsel.

*3. Failure to challenge the underrepresentation of Native Americans on the jury panel.*

As previously stated, we have remanded this matter to the circuit court for findings of fact and conclusions of law regarding the underlying merits of St. Cloud's claim as to the make-up of the jury panel. Similarly, as to how the underlying claim bears on the allegations of ineffective assistance of counsel, the circuit court made no findings of fact and conclusions of law. On remand, after considering the merits of St. Cloud's claim on this issue, the court should also make findings as to whether failure to challenge the underrepresentation of Native Americans on the jury panel constituted ineffective assistance of counsel.

## IV. WAS THE JURY PROPERLY INSTRUCTED ON THE KIDNAPPING CHARGES?

As we view *St. Cloud II,* the issue of jury instructions on the kidnapping charges was raised and thoroughly considered in that decision on direct appeal. *St. Cloud II,* 465 N.W.2d at 180–82. *See Cowell v. Leapley,* 458 N.W.2d 514, 520 (S.D.1990). *See also State v. Lykken,* 484 N.W.2d 869, 875–78 (S.D.1992) (discussing kidnapping charges in conjunction with charges of rape). As to this issue we apply the principle of res judicata, which is applicable in habeas corpus proceedings, and decline to revisit the jury instruction question again. *Id.*

In summary, we find that the state of South Dakota has jurisdiction over St. Cloud under the circumstances of this case. Because he has standing to challenge the jury panel makeup, we remand to the circuit court so that the merits of this claim can be reached. We affirm the circuit court's findings on the ineffective assistance of counsel claims regarding counsel's failure to investigate and introduce medical records; but remand on the question of failure to challenge the composition of the jury panel. Finally, we affirm the circuit court on the issue of jury instructions.

MILLER, C.J., and HENDERSON and AMUNDSON, JJ., concur.

SABERS, J., concurs in result.

SABERS, Justice (concurring in result).

I concur in result on Issues I and II. Since we are remanding this case to the trial court on Issue II, I see no reason to reach any of the other issues.